**Opinion issued December 19, 2013**



In The

# Court of Appeals

For The

# First District of Texas

——————————

## NO. 01-11-00898-CR

——————————

**CORNELL SMITH, JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 179th District Court**
**Harris County, Texas**
**Trial Court Case No. 1316670**

---

# O P I N I O N

A jury found appellant, Cornell Smith, Jr., guilty of the offense of murder,[1]

and the trial court assessed his punishment at confinement for forty years. In his

first of six issues, appellant contends that trial court erred in allowing the State to

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02 (Vernon 2011).

seek an illegal sentence and mislead the jury panel during voir dire. In his remaining issues, he contends that the trial court erred in admitting evidence of a previously-recorded interview of a witness, irrelevant and prejudicial evidence, evidence of an extraneous offence, and hearsay evidence.

We affirm appellant's conviction, but reverse and remand for a new punishment hearing.

### Background

Ned White, a maintenance man at the Apache Springs apartment complex, testified that on May 30, 2009, while walking through the complex, he saw two men, later identified as Daniel Sepeda, the complainant, and his younger brother, Gregory Ramos, washing a car. After White spoke to them for a few minutes, he returned to an area outside of a friend's apartment, where he watched television. White then saw two young black men pass by the apartment; one wore a bandana around his head and the other a bandana around his neck. White later heard two gunshots, ran inside his friend's apartment, and locked the door. He then looked out from a window and saw the two men, each holding a handgun, run toward and then past his friend's apartment. White exited the apartment to see that Sepeda had been shot.

Jessica DeLaRosa, a resident at the apartment complex, testified that on May 30, 2009, she, while standing on her balcony, saw the complainant and a young

2

child washing a car in the apartment complex parking lot. Approximately one or two minutes after she went inside her apartment, she heard two gunshots. When she looked back to the parking lot, she saw two black men running away.

Harris County Sheriff's Office ("HCSO") Sergeant C. Clopton testified that at about 2:00 p.m. on March 30, 2009, he was dispatched to the apartment complex to investigate the shooting. Clopton identified three witnesses to the shooting: Laura Vincent, the complainant's fiancé, Ramos, and White. Ramos, who was eleven years old at the time, appeared "very scared or traumatized" but "could describe what had occurred." Clopton interviewed Ramos and recorded the interview.

Ramos testified that on May 30, 2009, he was helping the complainant wash his car. The complainant told Ramos to find Vincent, who lived at the apartment complex, and ask her to bring him his gun because he had seen someone watching him. Later, the complainant and Ramos were approached by two young black men who said something to the complainant. Ramos could not remember what was said, but when the complainant stood up to face the men, he told Ramos to "get back." Ramos climbed into the back seat of the car, and, approximately five seconds later, heard two gunshots. When he looked out of the car, he saw the complainant bleeding from his neck and the two men running away. Later, Ramos gave a recorded statement to a police officer.

3

Ramos further testified that, at the time of trial, he remembered the "important" events of the shooting, but could not remember "every single detail." On cross-examination, Ramos noted that he remembered telling a police officer that he had seen the complainant pull a gun from his waist. And, over appellant's objection, the State then offered, and the trial court admitted into evidence, a redacted audio recording of Ramos's statement to Sergeant Clopton.

Bobby Williams, Jr., appellant's cousin, testified that on May 30, 2009, Roderick Brooks, another cousin, picked him up in a white Buick to run errands. At some point, Brooks received a cellular telephone call, and the two drove to pick up appellant and Marquieth Jackson. Appellant then asked Brooks to drop him off at an apartment complex to meet some friends at around 12:30 or 1:00 p.m. After Brooks parked the car at the apartment complex, appellant and Jackson exited the car.

Approximately five minutes later, Williams heard a gunshot, and appellant ran back into the car, saying that someone "tried to rob him," "the guy shot him," and "he shot the guy." Although Williams wanted to take appellant to the closest hospital, Houston Northwest Memorial Hospital, appellant insisted on going to Doctors Hospital, which was further away. Brooks told Williams to lie to law enforcement officers and state that they had picked up appellant and Jackson from

4

a nearby convenience store. Williams later told officers that he did not know that appellant had a gun with him until he got back into the car after the shooting.

Houston Police Department ("HPD") Officer T. Winn testified that on May 30, 2009, he was dispatched to check on appellant at Doctors Hospital because he was a shooting victim. Appellant told Winn that he was shot and robbed while walking to a store in the 6800 block of West Montgomery. Winn investigated the parking lot of the store, but he did not see any evidence that a shooting had occurred or find any witnesses.

Glenn Bowie testified that on May 13, 2009, he walked to a gas station near his apartment to buy food. On his way to the gas station, two black men punched him in the ribs and mouth, stole his wallet, and drove away in a blue Cadillac. Law enforcement officers later asked Bowie to identify two potential suspects, and Bowie identified appellant and Jackson as the men who had robbed him.

HPD Officer J. Salazar testified that on May 14, 2009, he received a call from Bowie claiming that he had seen the two men who had robbed him the previous day. Bowie told him that the men left in an "aqua blue" Cadillac with "front end damage." Salazar later pulled over a car matching Bowie's description. Appellant was driving the car, Jackson was in the passenger seat, and Chris Hines sat in the back seat. Bowie specifically identified appellant and Jackson as his assailants, and he later identified appellant from a photograph lineup.

5

Appellant testified that he had previously gotten into a fight with the complainant when he was in high school. On May 30, 2009, appellant and Jackson were walking back from a store when Brooks offered to give them a ride to the Apache Springs apartment complex to sell marijuana. When they arrived, Brooks handed a gun to appellant. After appellant and Jackson sold marijuana in one of the apartments, appellant "locked eyes" with the complainant. Appellant kept walking, but the complainant and Jackson soon began fighting each other. The complainant pulled a gun and fired it at Jackson, but he missed and struck appellant instead. Appellant then fired his gun at the complainant, turned around, and ran away.

## Voir Dire

In his first issue, appellant argues that, during voir dire, the trial court erred in allowing the State to seek an "illegal sentence" and "misled the jury panel on the grave consequences of their potential verdict" because the State "erroneously informed potential jurors that [appellant] would be eligible for parole if he were convicted of capital murder, when in fact he was facing a sentence of life without the possibility of parole."

A Harris County grand jury issued a true bill of indictment, accusing appellant of committing the offense of capital murder. *See* TEX. PENAL CODE ANN.

6

§ 19.03 (Vernon Supp. 2013). Prior to September 1, 2009, the Texas Penal Code provided that,

> In a capital felony trial in which the state does not seek the death penalty, prospective jurors shall be informed that the state is not seeking the death penalty and that a sentence of life imprisonment *without parole* is mandatory on conviction of the capital felony.

Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, 2005 Tex. Gen. Laws 2705, 2705 (amended 2009) (emphasis added) (current version at TEX. PENAL CODE ANN. § 12.31(b)(2) (Vernon Supp. 2013)). The Texas Legislature later amended the provision to provide that if a case is transferred from a juvenile court to a criminal district court, prospective jurors shall be informed that a sentence of life imprisonment *with parole* is mandatory on conviction of the capital felony. Act of May 29, 2009, 81st Leg., R.S., ch. 765, § 1, 2009 Tex. Gen. Laws 1930, 1930. The amendment states that the change only applies to offenses committed on or after September 1, 2009, the effective date of the amendment. *Id.* § 3.

Here, the indictment alleged that appellant committed the offense of capital murder on or about May 30, 2009. Because he was sixteen years old at the time that he shot the complainant, appellant's case was initially brought in a juvenile court and then transferred to the criminal district court. The trial court did not instruct the venire panel pursuant to section 12.31(b). And appellant complains of the following statements made by the State during voir dire, discussing the applicable punishment in the case:

| | |
|---|---|
| [STATE]: | Well, the way it works with capital murder, you hear the case and decide whether or not the defendant committed the crime or not and it's just by statute that the punishment is automatically life. For a certified juvenile, it's not possible to seek the death penalty on them; but if they are convicted of capital murder, they get life in prison. |
| | Now, an adult that gets convicted of capital murder gets life without the possibility of parole, but there is a distinction made for juveniles that are certified as adults. It's a life sentence, but there's a possibility of parole. |
| [VENIRE PERSON]: | So, in this case, there is a possibility of parole? |
| [STATE]: | I can't go into the facts of this case; but if one is certified as a juvenile and they are charged with capital murder, convicted of capital murder, the sentence is automatic life. It can't be death, life with the possibility of parole. |

Appellant further complains of the following exchange between the State and another venire person:

| | |
|---|---|
| [VENIRE PERSON]: | I have a question. On the part about if they are certified as an adult and they are convicted, what is the longest sentence – I mean, you said that he could be paroled, but how long would they have to serve before they would be eligible for parole? |
| [STATE]: | For a certified juvenile, they're not eligible for parole until they have served 40 years. |
| [VENIRE PERSON]: | Forty years? Four or forty? |
| [STATE]: | Forty. |

8

To the extent that appellant complains that the State engaged in improper jury argument during voir dire, we note that a party must both object and pursue the objection to an adverse ruling to preserve error regarding allegedly improper jury argument. *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007). Likewise, a defendant must timely object to remarks by the State and the trial court during voir dire. *See Marshall v. State*, 312 S.W.3d 743, 745 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd); *Espinosa v. State*, 194 S.W.3d 703, 708 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (holding defendant failed to preserve for review issue of improper argument by State because he did not object when argument first made during voir dire).

Here, appellant did not object to the State's comments or request that the trial court instruct the venire panel pursuant to section 12.31(b). Without an objection, a defendant waives the complaint on appeal unless the alleged error was fundamental and affected substantial rights. *See* TEX. R. APP. P. 33.1(a)(1); *see also Brewer v. State*, 572 S.W.2d 719, 721 (Tex. Crim. App. 1978). A substantial right is affected when an error has a substantial and injurious effect or influence in determining a jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). If the error had no effect or only a slight influence on the verdict, it is considered harmless. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Appellant argues that the complained-of comments constituted "drastic misinformation" and "fundamental error." We note that the harm resulting from errors occurring in the context of jury formation can be difficult to discern from an analysis focusing on the ultimate outcome of a trial. *See Ford v.* State, 73 S.W.3d 923, 925–26 (Tex. Crim. App. 2002). If a defendant does not present record evidence that demonstrates that the error deprived him of a jury comprised of legally-qualified jurors, we cannot say that he suffered harm.[2] *Gray v. State*, 233 S.W.3d 295, 301 (Tex. Crim. App. 2007). Appellant points to nothing in the record indicating that the State's comments or the trial court's error in not instructing the venire panel pursuant to section 12.31(b) resulted in the empaneling of unqualified jurors.

More importantly, the jury ultimately did not convict appellant of the offense of capital murder, but of the lesser-included offense of murder, and the trial court determined his punishment. We cannot conclude that the State's comments had a "substantial and injurious effect or influence in determining a jury's verdict."

---

[2] We note that in an unpublished opinion, the Texas Court of Criminal Appeals explained that a defendant was not harmed by a trial court's error in not properly instructing a venire panel under section 12.31(b) because she failed to establish that the error affected the legal qualifications of the venire members. *Murphy v. State*, No. PD-0798-08, 2009 WL 3368693, at *5–6 (Tex. Crim. App. Oct. 21, 2009) (not designated for publication); *see also McCluer v. State*, No. 14-09-00058-CR, 2010 WL 1438957, at *9–10 (Tex. App.—Houston [14th Dist.] Apr. 13, 2010, pet. ref'd) (not designated for publication) (holding error harmless where defendant made no showing failure to instruct venire members pursuant to section 12.31(b) resulted in deprivation of right to empanel qualified jurors).

*See King*, 953 S.W.2d at 271. Accordingly, we hold that appellant has not preserved this complaint for appellate review.

We overrule appellant's first issue.

### Recorded Recollection

In his second issue, appellant argues that the trial court erred in publishing to the jury Ramos's prior recorded statement because "it was inadmissible hearsay that constituted improper bolstering and contained irrelevant and prejudicial material."

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *See Rodriguez v. State*, 203 S.W.3d 837, 841 (Tex. Crim. App. 2006). Therefore, we will not reverse a trial court's ruling as long as it is within the "zone of reasonable disagreement." *See id.*

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. *See* TEX. R. EVID. 801(d). Hearsay statements are generally inadmissible. *See* TEX. R. EVID. 802. However, recorded recollections are excepted from the hearsay rule:

> (5) **Recorded Recollection.** A memorandum or record concerning a matter about which a witness once had personal knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly, unless the circumstances of preparation cast doubt on the document's trustworthiness. If admitted, the memorandum or record

11

may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Tex. R. Evid. 803(5).

The State, as the proponent of the evidence, had the burden of showing that Ramos's previous statement was admissible under the hearsay exception. *See Cofield v. State*, 891 S.W.2d 952, 954 (Tex. Crim. App. 1994). Four prerequisites must be shown under rule 803(5). *Johnson v. State*, 967 S.W.2d 410, 416 (Tex. Crim. App. 1998). First, the witness must have "insufficient recollection to enable the witness to testify fully and accurately" about the event; second, the "memorandum or record" must be one "made or adopted by the witness"; third, the recollection must have been recorded "when the matter was fresh in the witness's memory"; and fourth, the recorded recollection must "reflect" the witness's prior "knowledge correctly[.]" Tex. R. Evid. 803(5).

Appellant argues that the trial court erred in admitting Ramos's previous statement as a recorded recollection because Ramos, at trial, did not lack a present recollection of the events. Ramos testified that he did not remember if appellant and Jackson had said anything to the complainant when they approached him. He further testified, "I remember the important, big things that happened. And it was two years ago, so I don't remember every single detail." Finally, he stated that he told the law enforcement officer some details that he could "no longer remember" because it had "been so long" since the shooting.

12

In the recorded statement played at trial, Ramos gave Sergeant Clopton general background information regarding the complainant and his family, including that his parents were deaf and the complainant was planning to marry. Specific to the offense, Ramos stated several times that he heard one of the two men who approached the complainant say, "Hold still," before he heard any gunshots. Ramos also stated that he saw the complainant pull the gun from his waistband and point it at the two men. However, at trial, he testified that he only saw the complainant stand up and he did not see the complainant pull the gun.

Although some of Ramos's recorded statement contained similar information to that he related at trial, his testimony and the statement indicate that he was not able to remember all of the details regarding the incident. Accordingly, the trial court could have reasonably concluded that Ramos was not able to testify "fully" and "accurately" at trial. *See, e.g., Spearman v. State*, 307 S.W.3d 463, 470 (Tex. App.—Beaumont 2010, pet. ref'd) (holding trial court could have reasonably concluded witness, who could not remember everything, could not testify fully and accurately, although he testified "to some recollection" of incident in question); *Brown v. State*, 333 S.W.3d 606, 613 (Tex. App.—Dallas 2009, no pet.) (holding witness's prior grand jury statement admissible under rule 803(5), although witness testified to some details at trial, where witness testified that he did not remember some details and recorded statement conflicted with some of his testimony).

13

Appellant also argues that because Ramos's "live testimony was essentially the same as his recorded statement," it "constituted improper bolstering." "Bolstering" is "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993) (emphasis in original) (citations omitted). Here, however, the State presented Ramos's recorded statement because, in the statement, he told Sergeant Clopton that the men who approached the complainant told him to "hold still," which conflicted with appellant's claim of self-defense.

Finally, appellant argues that the recorded statement was irrelevant and prejudicial because Ramos gave Sergeant Clopton a "description of [the complainant's] life history." *See* TEX. R. EVID. 402, 403. However, at trial, appellant objected to the statement only as "improper bolstering" and as inadmissible under rule 803(5). Thus, appellant has not preserved these complaints for appellate review. *See* TEX. R. APP. P. 33.1(a); *Geuder v. State*, 115 S.W.3d 11, 13 (Tex. Crim. App. 2003).

Accordingly, we hold that the trial court did not abuse its discretion in publishing to the jury Ramos's previous statement as a recorded recollection.

14

We overrule appellant's second issue.

## Irrelevant and Prejudicial Evidence

In his third issue, appellant argues that the trial court erred in allowing the complainant's mother to testify because "[n]one of her testimony was relevant to the issues at trial" and the sole purpose of her testimony was "to inflame the jury with an emotional display." In his fourth issue, appellant argues that the trial court erred in admitting into evidence pages from his "MySpace" internet account because they had "very little, if any, probative force" and "cast [him] in the light of a vulgar hooligan."

All relevant evidence is admissible unless otherwise excepted by the Constitution, statute, or other rules. TEX. R. EVID. 402. Evidence is relevant if it has any tendency to make more probable or less probable the existence of a consequential fact. *See* TEX. R. EVID. 401; *Moses v. State,* 105 S.W.3d 622, 626 (Tex. Crim. App. 2003).

Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." TEX. R. EVID. 403. The opponent of the evidence must demonstrate that the negative attributes of the evidence substantially outweigh any probative value. *Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990). The relevant criteria in a rule 403 analysis include, but are not limited to, (1) the probative value of the evidence; (2) the

15

potential to impress the jury in some irrational yet indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005); *Manning v. State*, 114 S.W.3d 922, 927–28 (Tex. Crim. App. 2003).

### *Mother's Testimony*

Prior to the testimony of the complainant's mother, Sandra Ramos, appellant's counsel stated that he "fail[ed] to see the relevance" of the testimony and requested that the trial court first hear her testimony outside the presence of the jury. After the trial court denied the request, she testified that she recognized the complainant's photograph in the State's autopsy report. She also testified that the complainant was "intelligent" and "funny," had learned sign language, had a job interview the day of the shooting, and had a child. When the State asked Ms. Ramos to describe the relationship between the complainant and Gregory Ramos, appellant stated that "this is going outside of the preview of the questions."

Although appellant's counsel generally stated that he "fail[ed] to see the relevance" of Ms. Ramos's testimony, he did not object to it or obtain a ruling from the trial court; he only requested a hearing from the trial court to determine the relevance of her testimony. To preserve error regarding the admission of evidence, a defendant must object each time that the inadmissible evidence is offered, or make a running objection, and obtain a ruling. *See Lane v. State*, 151

16

S.W.3d 188, 193 (Tex. Crim. App. 2004). And, even assuming that appellant's statement that Ms. Ramos's testimony regarding the relationship of the complainant and Gregory Ramos was "outside of the preview of the questions" constituted an objection, we note that such evidence had already been presented to the jury. Gregory had already testified, without objection, that he and the complainant were "[c]lose" and were together "[a]ll the time." Accordingly, we hold that appellant has not preserved this complaint for appellate review.

We overrule appellant's third issue.

### *MySpace Records*

The State offered into evidence exhibit 210, a list of messages that appellant had received on his MySpace internet account, and exhibit 211, the front page of his MySpace webpage. Appellant objected to their admission in the following exchange:

> [APPELLANT]: Judge, my position on the documents themselves, I fail to see the relevance under 403 or 404(b). I fail to see any relevance to these documents. I don't think there is an issue of him being in Atlanta. They had a police officer testify that he arrested him in Atlanta. So, I think the purpose of these documents is only to further inflame the jury with prejudicial statements from Myspace. Even though he has redacted portions of it, Judge, if a jury reads that in conte[x]t, they may put together words that are not here under their own imagination and we think it's prejudicial under 403 and 404(b) and we think it's irrelevant and it has

17

no bearing whatsoever on this case. We would object to it coming in, Your Honor.

[STATE]: And 210 . . . is relevant because there are three specific references that we'll show the jury that tell their communications to this defendant saying things along the lines of: Mommy said you need to get offline or delete all them pic because they look on Myspace. And then there's another reference that says: I love you, too, baby. Be careful on this Myspace page. You can't communicate with people you know.

And just, you know, the fact that they would be communicating that with him just further shows that he's in hiding. It's another sign of guilt, just like fleeing to Atlanta. There is actually no reference to Atlanta within these documents. We do have other documents from Myspace that do have that reference. We're not offering that at this time.

And then the purpose of 211 is just to show that the pictures, which actually are referred to in some of the comments, show that it is, in fact, him that set up this account, Baby Cash Free, and, you know, just to tie up that these communications are, in fact, to [appellant].

[COURT]: Okay. Well, I agree with the State in that I think they are relevant. And I don't see anything prejudicial about them, nothing. I think they're rather benign. So, I'm going to allow them in.

HPD Officer C. Pool then testified that he obtained a search warrant to seize appellant's MySpace records and read aloud from exhibit 210 the following three messages:

- Mommy said you need to get offline or delete all of them pics because they look on Myspace, Fo.

18

- Hey, how are you doing?  I heard what happened.  I tried to call you, but you didn't answer.
- I love you, too, baby.  Be careful on Myspace page.  You cannot communicate with people you know too.  So, how you like the job.

All three messages were left in June 2009, approximately one to two weeks after the shooting of the complainant.

The State argues that the MySpace records are relevant as evidence of appellant's flight from authorities.  Evidence of flight or attempts to cover up guilt are relevant to show a defendant's consciousness of guilt.  *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Cantrell v. State*, 731 S.W.2d 84, 92 (Tex. Crim. App. 1987).  Here, however, each of the MySpace records is a comment made by appellant's friends or family members, not appellant himself.  However, even assuming that the trial court erred in admitting into evidence the MySpace records, we conclude that any such error was harmless.

Error in the admission of evidence constitutes non-constitutional error that is subject to a harm analysis under Texas Rule of Appellate Procedure 44.2(b).  *Johnson*, 967 S.W.2d at 417.  Under rule 44.2(b), any non-constitutional error that does not affect substantial rights must be disregarded.  *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011).  "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King*, 953 S.W.2d at 271.  A conviction should not be overturned for such error if this Court,

19

after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect. *Cobb v. State*, 85 S.W.3d 258, 272 (Tex. Crim. App. 2002).

Here, as noted by the trial court, the vast majority of the messages admitted were "rather benign." Appellant asserts that the records were prejudicial largely due to "vulgarity," but the State and trial court agreed to redact any vulgar language from the records. And the evidence took very little time for the State to develop. Most of Officer Pool's testimony concerned other aspects of his investigation, and the majority of the questioning was done by appellant in cross-examination. Accordingly, we have fair assurance that any error of the trial court in admitting the MySpace records and photos of appellant did not influence the jury, or had but a slight affect. *See id.*

We overrule appellant's fourth issue.

**Extraneous Offense**

In his fifth issue, appellant argues that the trial court erred in admitting evidence of an "unadjudicated extraneous robbery" because he did not open the door to its admission and the robbery was not substantially similar to the instant offense.

Evidence of extraneous offenses is not admissible to prove the character of a person in order to show that he acted in conformity therewith. TEX. R. EVID.

20

404(b); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). However, such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b).

Extraneous-offense evidence is admissible to rebut a defensive theory as when raised in an opening statement or through the cross-examination of the State's witnesses. *See Ransom v. State*, 920 S.W.2d 288, 301 (Tex. Crim. App. 1994) (concluding trial court did not err in admitting evidence to rebut defensive theory raised on cross-examination of State's witnesses). However, the fact that a State's witness was cross-examined does not, in and of itself, authorize the introduction of extraneous-offense evidence. *Caldwell v. State*, 477 S.W.2d 877, 879 (Tex. Crim. App. 1972). The responses elicited from a State's witness on cross-examination must be sufficient to construct a defensive theory before the State may introduce extraneous-offense evidence in rebuttal. *See Walker v. State*, 588 S.W.2d 920, 922–23 (Tex. Crim. App. 1979). To raise a defensive theory sufficient to open the door to the introduction of extraneous-offense evidence, the cross-examination responses must undermine the State's testimony and effectively place in controversy a fact that testimony was offered to prove. *See Clark v. State*, 726 S.W.2d 120, 122 (Tex. Crim. App. 1986).

Evidence of an extraneous offense is admissible if it is relevant to show intent. TEX. R. EVID. 404(b); *Santellan v. State*, 939 S.W.2d 155, 168–69 (Tex. Crim. App. 1997). Intent can be characterized as a contested issue for purposes of justifying the admission of extraneous offense evidence if the required intent for the primary offense cannot be inferred from the act itself or if the defendant presents evidence to rebut the inference that the required intent existed. *Caro v. State*, 771 S.W.2d 610, 617 (Tex. App.—Dallas 1989, no pet.); *McGee v. State,* 725 S.W.2d 362, 364 (Tex. App.—Houston [14th Dist.] 1987, no pet.). Intent is most clearly in issue when the defendant argues that the charged offense was unintentional or the result of an accident. *Keller v. State*, 818 S.W.2d 425, 428–29 (Tex. App.—Houston [1st Dist.] 1991, pet. ref'd).

Here, the indictment alleged that appellant committed the murder of the complainant in the course of committing a robbery. And specific intent is an essential element of capital murder. TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2013); *Johnson v. State*, 932 S.W.2d 296, 301 (Tex. App.—Austin 1996, pet. ref'd). In his opening statement, appellant directly refuted that he shot the complainant in the course of committing a robbery, arguing,

> The prosecutor just told you a few moments ago you are going to have to put the puzzle together. He left something out. He just told you a few moments ago that [appellant] went to the location to rob – to take a vehicle, but he goes and runs away with a gun. We don't deny that [appellant] was at that location. . . . That was the car he was supposed

to be going to steal, as opposed to – according to the prosecutor's story. . . .

Yeah, [appellant] was at that location and he wasn't doing something honorable, but he wasn't robbing anybody. . . .

I want you to look at that exhibit, that photograph because the vehicle that [appellant] was supposed to steal was still there. Not only was his vehicle there, but his wallet was on it. It was no robbery, folks. Can you tell me if I am going to go there and rob you, I don't take the vehicle, I don't take your wallet, I don't take anything. . . .

If it was such a robbery, why didn't they take something? Shoot a man, he's down. I'm there to take his car, I don't take the car. I don't go to his wallet. I don't take anything from him of value. Why?

Appellant also cross-examined witnesses as to whether the scene reflected whether a robbery had been committed. He asked Ned White whether the complainant's car was still at the scene and whether the complainant's pockets "were pulled out as though someone had gone and ruffled through his pockets." Appellant also asked Gregory Ramos, "Did you ever [hear] the black males say: I've got a gun on you, we're going to rob you, take your car? You ever hear that?" And appellant engaged in the following line of questioning with Ramos:

[APPELLANT]: You do know that after the shooting your brother was laying down on the ground; is that correct?

[RAMOS]: Yes.

[APPELLANT]: You do know – was the car door still opened?

[RAMOS]: Yes.

[APPELLANT]: The CD was still playing?

[RAMOS]: Yes.

[APPELLANT]: So, someone would know that the keys are still in the car?

23

[RAMOS]:         Yes.

[APPELLANT]:     You do know that after shooting the gentlemen who were walking never ran towards the car and jumped in and took the car and left; is that correct?

[RAMOS]:         Yes, they never jumped in and took the car and left.

[APPELLANT]:     Did you ever hear at any time any of those gentlemen, black gentlemen say: This is a robbery, give me your car?

[RAMOS]:         No, they did not say this is a robbery, give me your car.

The State then sought to introduce evidence regarding the robbery of Glenn Bowie, which occurred seventeen days before the shooting of the complainant. In support of its admission, the State asserted that "the issue of their intent to rob this individual has been put at issue." The trial court concluded,

> I see the State's point of it. And I agree with you that there has been an impression made by you asking the same question often. And did anybody come up and say this to you? Did they say, give me your car and give me your keys? I'm going to take your car. This is an aggravated robbery. If they have one substantially like that out there, I think you're opening the door.

Appellant asserts that he did not "undermine the State's testimony" or establish a "defensive theory" justifying the admission of the extraneous robbery under rule 404(b). However, the record reveals that appellant repeatedly asserted during his opening statement that there was no indication that the shooting took place during a robbery. And appellant cross-examined two witnesses as to whether appellant and Jackson acted in a manner consistent with a robbery. Both these

24

points were directed at appellant's intent in shooting the complainant, an essential element of the State's case, in which it alleged that appellant committed the shooting intentionally in the course of committing a robbery. Thus, the trial court could have reasonably concluded that appellant had opened the door to the admission of the evidence concerning the robbery of Bowie. *See Powell*, 63 S.W.3d at 439–40 (concluding trial court did not err in admitting evidence to rebut defensive theory raised in opening statement); *see also Ransom*, 920 S.W.2d at 301.

Appellant also asserts that the two offenses were not substantially similar. However, when extraneous evidence is offered on the issue of intent, Texas courts have held that there is less need to show significant similarity between the facts of the other incidents and those of the case being tried. *Johnson*, 932 S.W.2d at 302. The degree of similarity simply need not be as great if offered to prove the issue of intent. *See Bishop v. State*, 869 S.W.2d 342, 346 (Tex. Crim. App. 1993); *Morrow v. State*, 735 S.W.2d 907, 909–10 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd). Here, Bowie was not shot; he was punched and his wallet was stolen. However, both incidents involved Jackson and appellant committing an offense together and involved the two approaching an unsuspecting person in a parking lot. Moreover, the robbery of Bowie took place only seventeen days before the shooting of the complainant. Under these circumstances, the trial court could have

reasonably concluded that the robbery of Bowie was substantially similar to the offense for which appellant was being tried. Accordingly, we hold that the trial court did not err in admitting evidence of the robbery of Bowie.

We overrule appellant's fifth issue.

## Punishment Evidence

In his sixth issue, appellant argues that the trial court, during the punishment phase of trial, erred in admitting into evidence disciplinary records from the Harris County Jail, the Harris County Probation Department, and the Texas Youth Commission because the offense reports constituted hearsay and were not admissible under the business records exception to the hearsay rule. *See* TEX. R. EVID. 803(6). Appellant asserts that the admission of these records into evidence violated his United States Constitution Sixth Amendment right to confront the witnesses against him.

### *Waiver*

The State first argues that appellant waived his complaint regarding the admission of his disciplinary records because although appellant "objected to voluminous records with the jail, juvenile probation, and [Texas Youth Commission]," he "failed to specifically refer to material deemed objectionable in those records." And the State asserts that "[m]uch of those records were relevant and admissible."

26

"[F]ailure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence.  This is true even though the error may concern a constitutional right of the defendant." *Saldano v. State*, 70 S.W.3d 873, 889 (Tex. Crim. App. 2002) (footnote omitted); *see Briggs v. State*, 789 S.W.2d 918, 923 (Tex. Crim. App. 1990) (noting constitutional error may be waived). General rules of preservation must be followed to preserve error on Confrontation Clause grounds.  *See Paredes v. State*, 129 S.W.3d 530, 535 (Tex. Crim. App. 2004) (holding Confrontation Clause argument not preserved because of failure to object on that ground in trial court); *see also Reyna v. State*, 168 S.W.3d 173, 176–77 (Tex. Crim. App. 2005) (applying error preservation requirement with regard to Confrontation Clause argument).

When an exhibit contains both admissible and inadmissible material, the objection must specifically refer to the material deemed objectionable.  *See Brown v. State,* 692 S.W.2d 497, 501 (Tex. Crim. App. 1985); *Maynard v. State,* 685 S.W.2d 60, 64–65 (Tex. Crim. App. 1985); *Wintters v. State,* 616 S.W.2d 197, 202 (Tex. Crim. App. 1981); *Hernandez v. State,* 599 S.W.2d 614, 617 (Tex. Crim. App. 1980).

Here, at the punishment hearing, the State first sought to admit into evidence Exhibit 228, appellant's disciplinary records from his time in jail.  Appellant objected,

Your Honor, for the record Exhibit 228 has statements about incidents, events that happened from other people, hearsay. Unless they are going to bring those witnesses in and I have the opportunity to cross-examine[] them, I would object to any document that contains hearsay, what someone else said. It denies me confrontational—hearsay confrontational objection. So, anything that has to do with what anyone else says in the file, any statements made by someone else, or conclusions made by someone else, I would object to its admission.

The State responded, "These are all business records that are kept by the jail.

They're an exception to hearsay for that purpose." The State asserted,

In those incidents the officers are not referring to a detailed narrative of the actual facts that happened. If they break up a fight, they are not detailing what actually happened in the fight. They are just detailing the witnesses that were involved and the fact that there was an infraction. And furthermore, the statements made by the police officers in the reports are not made for the purpose of anticipated testimony or litigation which would be kind of at the heart of any confrontation clause issues. *They are simply made just to document a disciplinary infraction by this inmate at the Harris County Jail.* These are not things that—you know, statements given in anticipation of any kind of testimony to be given.

You know, we can call every single officer from every single incident, but *we are going to be here until some time next week if we do that for the jail and for TYC and for juvenile probation.* And I think that's at the heart of why these records come in as a business records exception, and, you know, why jail records and parole records, disciplinary records, come in as an exception to hearsay.

(Emphasis added.) The trial court overruled appellant's objection, stating, "These

are business records and they have been on file for more than 10 days before trial.

And they are held and recorded through regular business."

Although appellant was required to make a timely and specific objection in order to preserve his Confrontation Clause issue, no specific language is necessary to preserve a complaint for appellate review. *Layton v. State*, 280 S.W.3d 235, 239 (Tex. Crim. App. 2009). All a party must do to preserve a complaint is to "let the trial judge know what he wants, why he thinks he is entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Id.* (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

Here, although appellant did not specifically object to certain page numbers of the complained-of documents, it is clear from the record that both the State and the trial court understood the nature of his objection. The State's response to his objection was specifically directed at the testimonial statements of officers and witnesses in the disciplinary records that described appellant's infractions in detail. And the State specifically argued that appellant was not entitled to confront those witnesses because of the "time" it would take to call each of them to testify. Moreover, the trial court, in overruling appellant's objection, clearly agreed with the State. Accordingly, we hold that appellant has preserved his Confrontation Clause complaint for review in regard to Exhibit 228.

The State later offered into evidence Exhibits 234 through 238, appellant's probation records. Appellant again objected on "hearsay, confrontational"

29

grounds, and the trial court overruled his objection. And the State offered into evidence Exhibit 240, appellant's records from the Texas Youth Commission. Appellant objected, stating, "The objection I had made previously, we feel it's hearsay, the confrontational issue." The trial court overruled the objection and admitted the exhibit into evidence, stating, "These are business records." Thus, in regard to Exhibits 234 through 238 and Exhibit 240, the trial court understood appellant's confrontation objection to be based on his previous argument as well. Accordingly, we hold that appellant has preserved his Confrontation Clause complaint for review in regard to Exhibits 234 through 238 and Exhibit 240.

### Testimonial Statements

The Confrontation Clause of the Sixth Amendment bars the admission of testimonial statements of a witness who does not appear at trial unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 59, 124 S. Ct. 1354, 1369 (2004); *Russeau v. State*, 171 S.W.3d 871, 880 (Tex. Crim. App. 2005). Generally speaking, a statement is "testimonial" if it is a solemn declaration made for the purpose of establishing some fact. *Crawford*, 541 U.S. at 51, 124 S. Ct. at 1364; *Russeau*, 171 S.W.3d at 880.

In *Russeau*, the State introduced into evidence at the defendant's punishment hearing "incident reports" from the Smith County Jail and "disciplinary reports"

30

from the Texas Department of Criminal Justice. 171 S.W.3d at 880. The reports contained "statements which appeared to have been written by corrections officers and which purported to document, in the most detailed and graphic of terms, numerous and repeated disciplinary offenses" by the defendant when he was incarcerated. *Id.* The corrections officers also "relied upon their own observations or, in several instances, the observations of others." *Id.* Several of the written reports were read aloud to the jury during the punishment phase. *Id.*

The Texas Court of Criminal Appeals held that the reports contained inadmissible statements under the Confrontation Clause because they contained "testimonial statements" from corrections officers whom the defendant did not have the opportunity to cross-examine. *Id.* at 880–81. The court noted that the statements in the reports "amounted to unsworn, *ex parte* affidavits of government employees and were the very type of evidence the [Confrontation] Clause was intended to prohibit." *Id.* at 881 (citing *Crawford*, 541 U.S. at 50, 124 S. Ct. at 1363).

In contrast, in *Ford v. State*, the State sought to introduce into evidence at a punishment hearing "inmate disciplinary grievance records from the Harris County Jail." 179 S.W.3d 203, 208 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd). The records were read into evidence as follows:

> February 5th, 2004, the defendant was charged fighting. Seven days
> loss of privileges, found guilty. October 15, 2003, extortion. June the

11th, 2003, extortion, ten days loss of privileges. April the 21st, 2003, assault on an inmate. April 21st, 2003, horseplaying, altercation, five days' loss of privileges. February the 24th, 1998, 25 days loss of privileges for fighting. February the 18th, 1998, fighting. February the 18th, 1998, fighting. And again February the 18th, fighting.

*Id.* The court contrasted the records with those at issue in *Russeau*, describing them as "sterile recitations of appellant's offenses and the punishments he received for those offenses." *Id.* Thus, the court concluded, the disciplinary records did not contain statements that could be considered testimonial in nature. *Id.*

Here, the documents contain several testimonial statements similar to those at issue in *Russeau*. For example, appellant's disciplinary records from the Harris County Sherriff's Office contained the following passage from Detention Officer M. Nguyen:

I observed an unidentified inmate standing in the shower of cellblock 5D1 looking directly at me and appeared to be holding his penis. Deputy Gilbert and I ordered the inmate to get out of the shower and participate with the inmate count. At approximately 09:05 hours, while conducting another visual security check, I observed the inmate standing in the shower with his issued county T-shirt off and half of his issued county pants off looking directly at me while holding and stroking his penis.

Appellant's disciplinary records from the Texas Youth Commission contain similar testimonial statements. For example, one incident report contained a statement from Anita Hyman that reads as follows:

[Appellant] was disrupting in Ms. Richmond's class. He was sent out to security. Youth refused to go. Student was counseled by staff and refused to comply. Mr. Henderson tried counseling with [appellant].

32

He refused all counseling. Youth then moved away from staff trying to run. I grabbed [appellant] to place him in a standing PRT. [Appellant] balled his fists up and swung at staff. Mr. Henderson took [appellant] and placed him into a part. At this time Mr. Spearman . . . came to assist. I then went down and secured his legs.

This statement, along with several others from the Texas Youth Commission documents, was read aloud at the punishment hearing. Unlike the statements at issue in *Ford*, these statements contained subjective observations from witnesses who did not testify at trial. Accordingly, we hold that the trial court abused its discretion in admitting the reports into evidence over appellant's hearsay and Confrontation Clause objections. *See Russeau*, 171 S.W.3d at 880–81; *Grant v. State*, 218 S.W.3d 225, 231 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (stating that "presence or absence of a subjective narration of events related to [the defendant's] guilt or innocence" establishes difference between testimonial and non-testimonial statements).

Although the trial court erred in admitting this evidence, we nevertheless will affirm if we determine beyond a reasonable doubt that the harm from the error did not contribute to the defendant's punishment. *Russeau*, 171 S.W.3d at 881. In determining whether error in admitting testimonial statements in violation of *Crawford* is harmless beyond a reasonable doubt, we consider: (1) the importance of the testimonial statements to the State's case; (2) whether the statements were cumulative of other evidence; (3) the presence or absence of evidence

33

corroborating or contradicting the statements on material points; and (4) the overall strength of the State's case. *Davis v. State*, 203 S.W.3d 845, 852 (Tex. Crim. App. 2006) (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986)); *Grant*, 218 S.W.3d at 233. The error does not require reversal unless there is "a reasonable possibility that the *Crawford* error, within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue." *Davis*, 203 S.W.3d at 852–53 (quoting *Wesbrook v. State,* 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)).

Here, as in *Russeau*, the State spent a substantial amount of time at the punishment hearing introducing appellant's disciplinary records. With the exception of one witness, Officer T. Vaughn, who testified that appellant had threatened him during his incarceration, none of the many testimonial statements were cumulative of the State's other witnesses. Also as in *Russeau*, the State had a sponsoring witness read several of the testimonial statements off the records from the Texas Youth Commission. And, as in *Russeau*, the State made several references to appellant's disciplinary records during its closing argument. For example, at one point, the State argued,

> Even in a disciplined, supervised facility, this man could not in any form or fashion play by the rules, could not possibly keep himself together, keep himself in order . . . . And he couldn't control himself at the Texas Youth Commission.

34

Although the State did admit other evidence during the punishment phase, we cannot conclude beyond a reasonable doubt that the trial court's error did not contribute to appellant's punishment. *See Russeau*, 171 S.W.3d at 881. Accordingly, we hold that appellant did suffer harm from the trial court's error in admitting the complained-of disciplinary records.

We sustain appellant's sixth issue.

## Conclusion

We affirm the judgment of the trial court as to appellant's conviction, reverse the judgment of the trial court as to appellant's punishment, and remand this cause for a new punishment hearing.

Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Publish.   TEX. R. APP. P. 47.2(b).